901 P.2d 297 (1995)
127 Wash.2d 512
LaJeanne BREWER, for Herself and as Personal Representative of the Estate of Pierce Edward Brewer, Appellant,
v.
FIBREBOARD CORPORATION; Owens-Corning Fiberglas Corporation; and Pittsburgh Corning Corporation, Respondents.
No. 62081-4.
Supreme Court of Washington, En Banc.
August 31, 1995.
*298 Schroeter, Goldmark & Bender, William Rutzick, Janet Rice, Seattle, for appellant.
Riddell, Williams, Bullitt & Walkinshaw, Paul Kundtz, Eileen Concannon, Seattle, Lee, Smart, Cook, Martin & Patterson, Steven G. Wraith, Seattle, Brobeck, Phleger & Harrison, Thomas Peterson, San Francisco, CA, Danaher, Tedford, Lagnese & Neal, Frederick Tedford, Hartfort, CT, for respondents.
SMITH, Justice.
On September 23, 1994, under RCW 2.06.030, the Court of Appeals, Division Two, certified to this court for review a decision of the Kitsap County Superior Court which under RCW 4.22.060 reduced a jury award in a personal injury case against multiple defendants by setoffs in the amount of prior settlements. We remand to the trial court for correction of the setoff amount.

*299 QUESTIONS PRESENTED

The first question presented is whether under RCW 4.22.060, in determining final judgment upon a jury award in a personal injury case involving multiple defendants, a setoff attributable to a settlement agreement should be based upon $21,000.00, the amount actually received, or upon $78,750.00, the amount reasonably expected, or upon $175,000.00, the full amount stated in the settlement agreement. The second question is whether under RCW 4.22.060 Appellant Brewer is required to obtain approval from the superior court before entering into a settlement agreement with a federal court-appointed settlement trust which is not a party to this lawsuit.

STATEMENT OF FACTS
From 1945 to 1953, Pierce E. Brewer served as a machinist mate with the United States Navy.[1] He reenlisted in 1954 and continued service with the Navy until 1966.[2] In 1966 he was employed by Lockheed Shipbuilding as a marine machinist for three months,[3] involved with new construction of ships and installation of insulation containing asbestos on pipes in the engine rooms.[4] He worked at the Puget Sound Naval Shipyard (PSNS) as a marine machinist from 1967 until December 23, 1988,[5] repairing, removing and installing machinery in the engine rooms, fire rooms and auxiliaries on carriers, destroyers, ships, and nuclear submarines.[6] This work involved installation and removal of insulation containing asbestos on pipes in enclosed areas.[7] He retired from the Naval Shipyard in 1988 and worked part time at Olympic College in Bremerton until April 1991.[8]
In 1978 Mr. Brewer was diagnosed as suffering from pleural thickening of the lining of the lungs, an asbestos-related condition.[9] In July 1991, his physical condition rapidly declined and he was diagnosed as suffering from mesothelioma.[10] He was given six months to two years to live.[11]
On March 15, 1991, Pierce E. Brewer filed a complaint in the Kitsap County Superior Court against Owens-Corning Fiberglas Corporation, Fibreboard Corporation, Pittsburgh Corning, Owens-Illinois, Incorporated, and E.J. Bartells.[12] On August 9, 1991, he filed a supplemental complaint for personal injury.[13] *300 The supplemental complaint stated in part that "[d]uring the period 1945 to the early 1970's, [Pierce E. Brewer] was exposed to asbestos and asbestos-containing products manufactured and/or sold by defendants"[14] and "[a]s a result of this exposure, ... Pierce E. Brewer ... developed [an] asbestos-related disease, including mesothelioma."[15]
On November 7, 1991, Pierce E. Brewer entered into a settlement agreement with the Manville Personal Injury Settlement Trust[16] (Trust).[17] The settlement agreement provided in part:[18]
1. I accept payment of the Settlement Amount [$175,000.00] as full settlement of my Trust claims. I intend my Release to be effective not only on behalf of myself but also my spouse, heirs, representatives, successors or assigns. I further agree that this Release extends to all my associated rights and claims of any kind against the Released Parties,[[19]] whether based in tort, scontract, [sic] fraud or any other legal or equitable theory, and whether I possess them now or may possess them in the future, including but not limited to all claims for my asbestos-related personal injury or wrongful death.
2. I accept payment of my Settlement Amount as follows:

Twelve percent (12%) of the Settlement Amount shall be paid within 20 business days after the Trust's receipt and approval of the Claimant's Proof of Claim and Release. The remaining eighty-eight percent (88%) shall be paid as provided in the Class Action Payment Plan.
3. As previously agreed to at the time I accepted the Trust's offer and pursuant to which this Release is executed, I understand the payments and payment terms described herein are and shall remain subject to the availability of adequate Trust funding.
Under this settlement agreement, Mr. Brewer received $21,000.00, representing twelve percent (12%) of the total settlement amount of $175,000.00, in cash. The remaining $154,000.00 was to be paid under the terms of the Class Action Payment Plan. A federal court order prevented him from suing the Manville Corporation. However, the Manville Trust was permitted to negotiate settlements with persons with "exigent" health conditions caused by exposure to asbestos.[20]
On September 24, 1992, Patricia G. Houser, executive director of the Manville Personal Injury Settlement Trust, stated it was unlikely Mr. Brewer would ever receive the *301 remaining $154,000.00 because of the financial condition of the Trust. She stated in her affidavit:
3. On or about September 1, 1992, I spoke with ... attorneys to explain our policies and procedures and to discuss the assets of the Trust and the problems the Trust has experienced because of the imbalance between assets and liabilities. The Trust's liabilities far exceed its assets.

4. The Trust's net assets equal approximately One Billion, Six Hundred & Ninety-one Million, Seven Hundred & Twenty-Four Thousand ($1,691,724,000.00), as of August 11, 1992, but most of these assets are not presently convertible into cash.

5. The Manville Trust has approximately 159,000 unsettled claims as of August 31, 1992, and continues to receive approximately 1,500 new claims per month.
6. It is my best judgment, based on correct information, that the Trust will only be able to pay a total of between 20% to 35% of any claimant's total settlement negotiated during the stay under the Trust's Exigent Health Settlement Plan. Because the bond payments from Johns-Manville extend to the year 2015, the Trust, in all likelihood, will be making payments on claims until that time.
7. Claims that have been negotiated and received a 12% first distribution payment under the Trust's Exigent Health Plan are unlikely to receive additional money next year. It is very unlikely that the Trust will be able to pay more than 12% to non-exigent or exigent cases next year. The second payment distribution will probably be less than 5%.[[21]]
(Italics ours.)
After the death of Pierce E. Brewer, his widow, Ms. LaJeanne Brewer, was appointed personal representative of his estate.[22] She pursued this action on behalf of the estate and herself. The case proceeded to a jury trial before the Honorable Terence Hanley on May 4, 1992.[23] On July 7, 1992, the jury returned a verdict in favor of Appellant Brewer for $372,300.00 in general and special damages.[24] The jury found no liability against Owens-Illinois Company, but held Fibreboard Corporation, Owens-Corning Fiberglas Corporation, and Pittsburgh Corning Corporation liable for the full amount.[25]
On September 4, 1992, Appellant Brewer gave notice of intent to enter into settlement agreements with Anchor Packing Company; Asbestos Corporation, Ltd.; Babcock & Wilcox; the Center for Claims Resolution, Armstrong Cork Company, GAF, and Turner & Newall; Combustion Engineering; Foster-Wheeler Energy Corporation; Garlock; Keene Corporation; and Parker-Hannifin Corporation; and moved for determination by the court of the reasonableness of the settlement agreements.[26] On February 23, 1993, the Kitsap County Superior Court, the Honorable Terence Hanley, determined that the November 7, 1991 settlement agreement between Mr. Brewer and the Trust for $175,000.00 was reasonable.[27]
On May 7, 1993, Judge Hanley entered judgment against Owens-Corning Fiberglas Corporation, Fibreboard Corporation and Pittsburgh-Corning Corporation for $136,643.56.[28] He determined the setoff amount by subtracting the actual value of the settlement agreement between Pierce E. Brewer and the Trust, $175,000.00, and other settlements totaling $43,100.00; and reduced special damages by $17,800.00 from the $372,300.00 jury award. Then, after adding $243.56 for attorney fees and costs, the judgment totaled $136,643.56.[29]
*302 On June 2, 1993, Appellant Brewer filed a motion for review by the Court of Appeals, Division Two, of the trial court's judgment entered on May 7, 1993.[30] The Court of Appeals certified the matter to this court on September 23, 1994. We accepted certification on September 27, 1994 under RCW 2.06.030.

DISCUSSION
In 1981, the Legislature created the Tort Reform Act, codified in RCW 7.72 and RCW 4.22. As relevant to this case, RCW 7.72 is principally concerned with product liability and RCW 4.22 with right of contribution. The purpose of the Tort Reform Act is stated in the preamble to RCW 7.72:[31]
Tort reform in this state has for the most part been accomplished in the courts on a case-by-case basis. While this process has resulted in significant progress and the harshness of many common law doctrines has to some extent been ameliorated by decisional law, the legislature has from time to time felt it necessary to intervene to bring about needed reforms such as those contained in the 1973 comparative negligence act.
The purpose of this amendatory act is to enact further reforms in the tort law to create a fairer and more equitable distribution of liability among parties at fault.

Of particular concern is the area of tort law known as product liability law. Sharply rising premiums for product liability insurance have increased the cost of consumer and industrial goods. These increases in premiums have resulted in disincentives to industrial innovation and the development of new products. High product liability premiums may encourage product sellers and manufacturers to go without liability insurance or pass the high cost of insurance on to the consuming public in general.
It is the intent of the legislature to treat the consuming public, the product seller, the product manufacturer, and the product liability insurer in a balanced fashion in order to deal with these problems.

It is the intent of the legislature that the right of the consumer to recover for injuries sustained as a result of an unsafe product not be unduly impaired. It is further the intent of the legislature that retail businesses located primarily in the state of Washington be protected from the substantially increasing product liability insurance costs and unwarranted exposure to product liability litigation.
(Italics ours.)
This case involves that part of the Tort Reform Act relating to right of contribution, codified in RCW 4.22. Specifically, RCW 4.22.060 provides:
(1) A party prior to entering into a release, covenant not to sue, covenant not to enforce judgment, or similar agreement with a claimant shall give five days' written notice of such intent to all other parties and the court. The court may for good cause authorize a shorter notice period. The notice shall contain a copy of the proposed agreement. A hearing shall be held on the issue of the reasonableness of the amount to be paid with all parties afforded an opportunity to present evidence. A determination by the court that the amount to be paid is reasonable must be secured. If an agreement was entered into prior to the filing of the action, a hearing on the issue of the reasonableness of the amount paid at the time it was entered into may be held at any time prior to final judgment upon motion of a party.

The burden of proof regarding the reasonableness of the settlement offer shall be on the party requesting the settlement.
(2) A release, covenant not to sue, covenant not to enforce judgment, or similar agreement entered into by a claimant and a person liable discharges that person from all liability for contribution, but it does not discharge any other persons liable upon the same claim unless it so provides. However, the claim of the releasing person against other persons is reduced by the *303 amount paid pursuant to the agreement unless the amount paid was unreasonable at the time of the agreement in which case the claim shall be reduced by an amount determined by the court to be reasonable.
(3) A determination that the amount paid for a release, covenant not to sue, covenant not to enforce judgment, or similar agreement was unreasonable shall not affect the validity of the agreement between the released and releasing persons nor shall any adjustment be made in the amount paid between the parties to the agreement.

(Italics ours.)

REASONABLENESS HEARING
RCW 4.22.060 "creates a right of contribution between joint tortfeasors."[32] It further requires "that the court enter either a finding that the settlement amount is reasonable or that another, presumably higher, amount is reasonable".[33] "It is incumbent upon a party having a significant interest in seeing that the settlement is found to be unreasonable to present some evidence to controvert the settling parties' evidence."[34] RCW 4.22.060 "sets out procedures for enforcing the right of contribution and provides for court approval of settlements".[35] However, the statute does not specify what factors a trial court should consider in a hearing on the reasonableness of a settlement agreement.[36]
In Glover v. Tacoma General Hosp.,[37] this court observed:
The reasonableness determination ... is of great importance to both settling and nonsettling defendants. Unfortunately, despite the importance of the term, the Legislature declined to define it, apparently deferring to the courts. The Senate Select Committee on Tort and Product Liability Reform Final Report ... contains the following discussion on this issue:
The bill does not establish any standards for determining whether the amount paid for the release was reasonable or not. It is felt that the courts can rule on this issue without specific guidance from the Legislature. The reasonableness of the release will depend on various factors including the provable liability of the released parties and the liability limits of the released party's insurance.
Senate Report, at 54. Presumably, therefore, this court has a relatively free hand in determining what factors should be considered at the reasonableness hearing.
In Glover we announced factors to be considered in a reasonableness hearing, including:[38]
[T]he releasing person's damages; the merits of the releasing person's liability theory; the merits of the released person's defense theory; the released person's relative faults; the risks and expenses of continued litigation; the released person's ability to pay; any evidence of bad faith, collusion, or fraud; the extent of the releasing person's investigation and preparation of the case; and the interests of the parties not being released.
This court has recognized that "each of these factors are proper considerations for a trial judge to use in approving settlements..." and "emphasize[d] ... that no one factor should control. The trial judge faced with this task must have discretion to weigh each case individually."[39] A trial court's finding of reasonableness is a factual determination that will not be disturbed on appeal when supported by substantial evidence.[40]
*304 RCW 4.22.060(1) requires a claimant to provide "five days' written notice of such intent to all other parties and the court".[41] This court has stated:
The requirement for 5 days' notice to all parties of the reasonableness hearing is obviously for the purpose of giving all parties the opportunity to appear and be heard at that hearing and to do their best to insure that the settlement is in fact a reasonable onea matter of obvious importance to all nonsettling parties because the claim of a settling plaintiff against a nonsettling party is ordinarily reduced by the amount of the settlement. The 5-day written notice to parties requirement of the statute, RCW 4.22.060(1), is much the same as the requirement for a 5-day notice of presentation for findings of fact (CR 52(c)) and the 5-day notice of presentation for judgments (CR 54(f)(2)). Under these latter two rules, 5 days' notice is required unless a party in some manner waives such notice or the trial court for cause shown shortens the timeproviding that, in either event, no prejudice ensues. By analogy, we hold that these same principles should be applicable to the situation before us.
(Footnotes omitted Italics ours.)[42]
In Glover, the plaintiff petitioned for approval of her settlement agreement with five of the six named defendants. "Tacoma General, [the sixth named defendant], ... did not participate in ... [settlement] negotiations, and the release instrument specifically excluded Tacoma General."[43] The trial court found the settlement reasonable.[44] Tacoma General challenged the trial court's finding and urged this court to determine the proposed settlement was unreasonable. This court concluded the findings of the trial court were supported by substantial evidence.
"The effect of a reasonableness finding ... is to determine the amount of offset to which [a tortfeasor or joint tortfeasor] will be entitled against that judgment."[45] This court in Glover concluded that "this result [wa]s most consistent with the Legislature's intent in passing the tort reform act"[46] and that "[a] review of the common law prior to the Act and an analysis of the Act itself demonstrate[d] this point".[47]
In Fraser v. Beutel,[48] the Court of Appeals, Division Three, similarly addressed an issue where neither the plaintiff nor the settling defendant complied with the notice provisions of RCW 4.22.060(1). The Court of Appeals stated that the settling defendant, Sunset, knew or should have known the importance of notice of the reasonableness hearing especially to "one of the entities released in [the] settlement ..."[49] when liability for contribution is a concern.
Appellant Brewer contends she was under no duty to provide notice to all parties and the court because the Trust was neither a "party" nor a "claimant". Respondent Fibreboard concedes the Trust was not a "party" to the litigation,[50] but argues that even if the Trust is considered to be neither a "party" nor a "claimant" to the litigation, Appellant was in the best position to comply with the notice requirement of RCW 4.22.060(1).
Pierce E. Brewer entered into the settlement agreement with the Trust on November 7, 1991. The parties to this action were given notice of his intent to enter into settlement agreements with other defendants on September 4, 1992,[51] but not notice of the settlement agreement with the Trust. Respondents, though, moved for a reasonable *305 hearing on the Trust settlement on August 21, 1992 prior to entry of final judgment.[52] On February 23, 1993, the trial court determined the settlement agreement between Mr. Brewer and the Trust was reasonable.[53] The court entered final judgment on May 7, 1993, and issued a memorandum decision on the reasonableness of the settlement agreement,[54] stating:
The problem in this case, it seems to the Court arises out of the nature of litigation. It is expensive, complicated and time consuming. Substantial amounts of time are required to be expended by counsel on both sides, expert witnesses must be retained and paid, etc. Had the reasonableness hearing been held at the time of the proposed settlement, various defendants' decisions whether or not to proceed to trial may well have been affected by those factors as well as others appearing at that time.
Plaintiffs argue that the statute is phrased in terms of money "paid" and not money contracted for. Looking at the purpose of the statute, however, the purpose to be accomplished ... and the reason for a reasonableness hearing, the Court concludes that the statute must be read to contemplate settlements based upon future consideration are required to comply with the statute as well as those based upon money contemporaneously paid. The drafters of the legislation didn't contemplate, and there seems to be little purpose for, a reasonableness hearing when the litigation has been fully settled.

The basic theory of all tort law is to make plaintiffs whole. Settlement is to be encouraged by the Courts and is the purpose of the legislation here in question. Plaintiffs argue that $48,000.00 is the maximum present value of their settlement and the setoff should be limited to that amount. They offer to assign all of the settlement above that figure to defendants. The trouble with all of this is, it seems to the Court, that it would shift the burden of reasonableness which is ascribed to plaintiffs by the statute to defendants after the fact of settlement and in the absence of timely hearing or input. Plaintiff's [sic] were aware of Johns-Manville's financial situation at the time they entered into the settlement. They took the risk without the Court's approval as contemplated by the statute and it would be unjust to now shift the burden of their settlement decision to defendants.

Hence, the Court concludes that the settlement was reasonable at the time it was reached.
(Italics ours.)[55]
The parties in this case agree that the settlement agreement between Pierce E. Brewer and the Trust was reasonable. However, Respondents claim they were denied due process because Mr. Brewer did not provide them or the court with the statutorily mandated 5-days' notice of intent to enter into the settlement agreement with the Trust. "[D]ue process requires that the released but nonsettling defendant have sufficient notice of the reasonableness hearing to allow it to participate and raise issues challenging the settlement.... Without such notice, the nonsettling defendant is not bound by the determination of reasonableness."[56] The statute, RCW 4.22.060(2), provides that the "claim ... is reduced by... an amount determined by the court to be reasonable".[57]
The notices were given and reasonableness hearings on other settlement agreements were held prior to entry of final judgment. Mr. Brewer simply did not provide Respondents with notice of his intent to settle with the Trust. Appellant offered no satisfactory reasons for not complying with the notice requirement. Despite this, though, the requirements of due process were satisfied when (1) Respondents moved the trial court for a reasonableness hearing *306 on the Brewers' settlement agreement with the Trust on August 21, 1992, (2) a reasonableness hearing was held on February 23, 1993, and (3) the trial court on May 7, 1993 found the settlement reasonable, entered final judgment and issued its memorandum decision. The trial court properly determined the $175,000.00 settlement was reasonable.

Proper Determination of "Amount Paid"
The trial court initially reduced the jury verdict of $372,300.00 to $354,500.00 by limiting Mr. Brewer's judgment for special damages of $72,300.00 to $54,500.00, "in accordance with the proof adduced at trial".[58] It then determined $218,100.00 to be the proper set-off amount by adding the total amount of the settlement agreement with the Trust, $175,000.00, and $43,100.00, the sum of other settlement agreements the Brewers entered into with other defendants. The setoff amount was subtracted from the jury verdict, leaving the Brewers with a total of $136,400.00. The trial court then awarded Appellant $243.56 for costs and attorney fees, making the total judgment awarded to Appellant $136,643.56. Appellant contends the trial court's reduction of the $354,500.00 jury verdict to $136,643.56 against Fibreboard, Owens-Corning and Pittsburgh-Corning violated RCW 4.22.060(3).
Appellant asserts the trial court should have setoff the adjusted jury verdict of $354,500.00 by the amount actually paid by the Trust, $21,000.00, plus the amounts of the other settlements, which would have totaled $43,100.00.[59] Appellant thus contends the correct set-off amount should have been $64,100.00 and not $218,100.00.
Appellant relies on McNair v. Owens-Corning Fiberglas Corp.,[60] a decision of the United States Court of Appeals for the Fifth Circuit. The court in McNair interpreted sections 33.013-.016 of the Texas Civil Practice and Remedies. The Texas statute is not identical nor substantially similar to our Washington statute. That case, then, has no relevance to this case.
Appellant also urges this court to follow the reasoning of Krivanek v. Fibreboard Corp.[61] In Krivanek, the Court of Appeals, Division One, set off the jury verdict by the total amount of the settlements actually paid to the appellant prior to trial.[62] Defendant Owens-Corning Fiberglas, Inc. (OCF) claimed the trial court erred in not conducting the reasonableness hearing required by RCW 4.22.060(1).[63]
Appellant in that case settled with 10 of the 11 named defendants prior to trial. The jury awarded appellant's estate $150,000.00 in damages for her product liability and death and survival claims. The trial court "reduced the $150,000.00 verdict by the amounts actually paid by the settling defendants... but did not reduce the verdict by the Fibreboard settlement because Fibre board had not yet paid ...".[64] The court "ordered OCF to pay the remaining portion of the verdict ..." because OCF would be "reimbursed to the extent Fibreboard paid".[65] In her appeal, Appellant Krivanek claimed the "jury awarded a low verdict because it ignored the evidence."[66] The Court of Appeals remanded the case for retrial only on the issue of damages, concluding that "the *307 trial court abused its discretion in unreasonably finding the damage award to be within the range of the evidence."[67] Respondent OCF "claimed it was error for the court not to conduct a reasonableness hearing ..." under RCW 4.22.060(1). The Court of Appeals, however, concluded a reasonableness hearing was "not necessary because the judgment against [the respondent] was less than the ... settlement [with Fibreboard]."[68]
In this case, the Brewers entered into a settlement agreement with the Trust for $175,000.00. It is undisputed that the Trust actually paid the Brewers $21,000.00. This left a balance of $154,000.00 owed by the Trust to the Brewers. It is also undisputed that given the financial condition of the Trust, it is unlikely the Trust will be able to pay even the anticipated 45 percent of the $175,000.00 settlement, or $78,750.00, or a balance of $57,750.00 after reduction of the $21,000.00 already received.[69]

Statement of Additional Authorities
Following the en banc hearing before this court, Appellant filed a "Statement of Additional Authorities" under RAP 10.8 which consisted of 368 pages comprising "Amended Memorandum, Orders and Final Judgment in Findley, et al. v. Falise, et al., In re Joint Eastern and Southern Districts Asbestos Litigation, 878 F.Supp. 473 (E. & S.D.N.Y. 1995), together with the stipulation of Settlement, and attachments." As the rule allows, Appellant presented no argument for this citation. That case has been previously noted in the record before us and does not constitute "additional authorities".
RAP 10.8 places no limitation on the volume of a statement of additional authorities. This submission, however, is more in the nature of a supplementation of the record. At any rate, we reject any interpretation of RAP 10.8 which would allow filing of a 368-page document. Even briefs are limited to 50 pages under RAP 10.4(b). We therefore reject this purported statement of additional authorities and will not consider the extensive volume of material it contains.

SUMMARY AND CONCLUSIONS
The Legislature enacted the Tort Reform Act to encourage settlement and to assure tort victims complete satisfaction of their claims. It is not disputed that the $175,000.00 settlement agreement between Pierce E. Brewer and the Manville Personal Injury Trust was reasonable. Mr. Brewer did not provide Respondents with notice of his intent to enter into a settlement agreement with the Trust. Although this was a violation of due process under RCW 4.22.060, that violation was overcome when the court conducted a reasonableness hearing upon motion of Respondents. The trial court found the settlement agreement to be reasonable prior to entry of final judgment.
Consistent with RCW 4.22.060, a settlement agreement found to be reasonable may be used in determining a proper setoff amount. The trial court erroneously deducted the full amount of the $175,000.00 settlement with the Manville Trust which, though reasonable, will likely never be received by the Brewers. In fact, the only likely amount is the $21,000.00, or 12 percent, actually received. The predictive formula of 45 percent under the Class Action Payment plan, allowing *308 the Brewers a total of $78,750.00, is speculative and unreliable given the acknowledged current financial condition of the Manville Trust.
We believe the better and fairer result would be achieved by valuing the settlement for set-off purposes at $21,000.00, the amount actually received by the Brewers under the $175,000.00 settlement agreement. Recalculation of the net award to the Brewers would then result in a revised judgment of $290,643.56 determined as follows:

Jury Award $372,300.00
Less Reduction:
 Special Damages $17,800.00 - 17,800.00
 __________
Less Setoff:
 Trust Settlement $21,000.00
 Other Settlement 43,100.00 - 64,100.00
 __________ ___________
Net Jury Award $290,400.00
Attorney Fees and Costs 243.56
 ___________
Total Judgment $290,643.56
 ===========

We affirm the determination by the Kitsap County Superior Court that the $175,000.00 settlement agreement between Pierce E. Brewer and the Manville Personal Injury Settlement Trust was reasonable; but remand for recalculation of the net jury award based upon $354,500.00 less a reduction of $17,800.00 in special damages, less set-offs totaling $64,100.00, plus $243.56 for attorney fees and costs, for a total judgment of $290,643.56.
DURHAM, C.J., and DOLLIVER and ALEXANDER, JJ., concur.
JOHNSON, Justice (concurring).
I agree with the result reached by the majority that the offset under RCW 4.22.060(2) is the amount paid to the Plaintiff. This result is consistent with the language of the statute and with longstanding case authority. I write separately to point out the majority's discussion of the reasonableness hearing under RCW 4.22.060(1) is unnecessary to the resolution of this case and draws the dissent away from the real issue. This is not a case about whether the settlement amount is reasonable or whether a present value calculation is appropriate when a structured settlement is offset. The issue in this case is whether the Plaintiff may recover the uncollectible portion of the settlement with one joint tortfeasor from the remaining joint tortfeasors.
The Plaintiff here actually received $21,000 from Johns-Manville as partial payment on a $175,000 structured settlement. Johns-Manville's bankruptcy, coupled with the large number of similar claims, has made it unlikely that the Plaintiff will receive the remaining payments. The Defendants argue the Plaintiff's judgment against them must be offset by the full $175,000 or at most the present value of that amount. The Plaintiff argues the proper offset is the $21,000 actually paid.
The Defendants base their position on RCW 4.22.060(1), which sets forth the procedures for determining the reasonableness of a settlement. These procedures were not followed here. This would be important if the Defendants were arguing the settlement amount was too low and therefore prejudiced their interests. However, the Defendants here argue that the settlement amount, $175,000, is the correct set off, and both the majority and dissent recognize this. Because the Defendants concede the reasonableness of the original settlement, however, their arguments with regard to whether proper procedures were used are irrelevant. The issue is uncollectibility, not reasonableness of the original settlement.
Although RCW 4.22.060 does not expressly discuss uncollectibility, the implication is clear. The effect of settling with one of several joint tortfeasors is set forth in RCW 4.22.060(2), which reads in pertinent part:
[T]he claim of the releasing person against other persons is reduced by the amount paid pursuant to the agreement unless the amount paid was unreasonable at the time of the agreement in which case the claim shall be reduced by an amount determined by the court to be reasonable.
(Emphasis added.) When interpreting a statute, we must give effect to the plain meaning of the statutory language. Department of Licensing v. Lax, 125 Wash.2d 818, 822, 888 P.2d 1190 (1995). The words "amount paid" are clear. The Legislature could have said by the "amount payable" if that was the intent. The distinction is an *309 easy one, and I think the Legislature understood the consequences of its word choice.
This interpretation is also supported by the Restatement (Second) of Torts § 885(3) (1979):
A payment by any person made in compensation of a claim for a harm for which others are liable as tortfeasors diminishes the claim against the tortfeasors, at least to the extent of the payment made, whether or not the person making the payment is liable to the injured person and whether or not it is so agreed at the time of payment or the payment is made before or after judgment.
(Emphasis added.) Again, the word choice suggests the offset looks retrospectively at those sums the Plaintiff has already collected rather than prospectively at what might be collected.
The reason for this word choice is very likely rooted in the common law doctrine of joint and several liability. A fundamental principle of joint and several liability is that each multiple tortfeasor is liable for all damages for which his or her tortious act is a proximate cause. Seattle First Nat'l Bank v. Shoreline Concrete Co., 91 Wash.2d 230, 235, 588 P.2d 1308 (1978). The plaintiff is entitled to a full recovery from any one of the defendants found to be liable. Id., at 235, 588 P.2d 1308.
At common law, an unsuccessful attempt to collect from one of the defendants is not a bar to obtaining an execution against another of the joint wrongdoers. Lovejoy v. Murray, 70 U.S. (3 Wall.) 1, 18 L.Ed. 129 (1865); Sessions v. Johnson, 95 U.S. 347, 24 L.Ed. 596 (1877); Verhoeks v. Gillivan, 244 Mich. 367, 370, 221 N.W. 287, 65 A.L.R. 1083 (1928). Accord Fowler V. Harper et al., The Law of Torts § 10.1, at 30 (2d ed. 1986).
A plaintiff could sue one tortfeasor, obtain partial satisfaction, and then sue another tortfeasor because liability was several as well as joint. A judgment against one tortfeasor did not have any effect on any other tortfeasor. Lovejoy, 70 U.S. at 17. Only full satisfaction, from whatever source, released all wrongdoers. Id., at 17. As explained by Lord Ellenborough in an early English case, "a judgment recovered in any form of action is still but a security for the original cause of action, until it be made productive in satisfaction to the party; and therefore till then it cannot operate to change any other collateral concurrent remedy which the party may have". Drake v. Mitchell, 3 East 251, 258, 102 Eng.Rep. 594 (K.B.1803).
The rationale for this rule was well stated by the Michigan Supreme Court:
Nothing short of actual satisfaction of the judgment by one of the joint tort-feasors should bar the injured party from having recourse to court process against the other trespassers. To hold otherwise is to deny the injured party the practical and just fruits of his adjudicated rights.... This being true, the law should not countenance and much less compel an election by the injured party among the joint wrongdoers which will absolutely free all but one of them and will entirely defeat recovery if that one happens to prove uncollectible.
Verhoeks, 244 Mich. at 372, 221 N.W. 287. Thus, under common law joint and several liability, a plaintiff who receives less than full payment from one joint tortfeasor has always had the option of recovering the balance from other joint tortfeasors.
In causes of action relating to asbestos, common law joint and several liability applies. Sofie v. Fibreboard Corp., 112 Wash.2d 636, 669, 771 P.2d 711, 780 P.2d 260 (1989). Thus, the Plaintiff here has the right to pursue one tortfeasor, obtain a judgment and then pursue other joint tortfeasors to recover uncollectible amounts. Although this case involves an uncollectible settlement rather than an uncollectible judgment, the principle is the same. Common law joint and several liability guarantees the plaintiff full recovery.
We recognized this consequence of joint and several liability in In re Johns-Manville Corp., 99 Wash.2d 193, 660 P.2d 271 (1983). In this related case, we held that plaintiffs were free to proceed against other defendants despite Johns-Manville's bankruptcy because the operation of joint and several liability meant that Johns-Manville was not an indispensable party to a suit. Johns-Manville, 99 Wash.2d at 198, 660 P.2d 271. *310 Implicit in this decision was a recognition that the plaintiffs were entitled to full recovery even if they received nothing from Johns-Manville.
Here the Plaintiff received part payment from Johns-Manville, and the payment must be offset so that the plaintiff does not receive a double recovery. However, the plaintiff is entitled to one full recovery, and, therefore, future speculative payments need not be offset.[1]
The dissent's position here is worthy of comment. It also focuses on the words "amount paid", stating the amount paid in a structured settlement is equal to the present value of the total settlement. This is correct, but does not resolve this case. In a typical structured settlement, the settling defendant pays out an amount of money to purchase an annuity. The amount paid would normally be equal to the present value of the settlement, and the other defendants would be credited with this amount.
In contrast, the number being called a present value in this case is being discounted not only for the time value of money but also for the very substantial risk it will never be paid. There is no precedent for treating an uncollectible settlement or judgment in this fashion. Instead, the clear weight of authority allows the Plaintiff to collect this amount from any other joint tortfeasor.
In summary, both the majority and dissent say much that is right. However, neither focuses on the correct statutory subsection and the principles of common law supporting it.
UTTER, J. Pro Tem, concurs.
TALMADGE, Justice (dissenting).
I dissent. The majority agrees with the trial court that a settlement between the Brewers[1] and the Manville Trust for $175,000 was reasonable, Majority, at 306, but then declines to allow an offset to the non-settling defendants for the amount of the reasonable settlement, determining instead that $21,000, the sum the Manville Trust actually paid to the Brewers, constitutes the offset in this case. Majority, at 306-308. This is contrary to RCW 4.22.060.

ANALYSIS

Framework Under 1981 Act for Reasonableness Hearings
In adopting the 1981 Product Liability and Tort Reform Act (1981 Act), the Legislature decided to make significant changes to the tort system to ensure fairness in the operation of the system. Laws of 1981, ch. 27, § 1. In the 1981 Act, the Legislature adopted comparative fault, contribution among joint tortfeasors, and the unique process of a reasonableness hearing to establish the amount of an offset for settlements against any judgment entered against the non-settling defendants. To effectuate Washington's longstanding policy of encouraging settlement of cases, the 1981 Legislature provided that a settlement would discharge the settling defendant from any liability to the plaintiff and any liability to non-settling defendants for contribution authorized by the 1981 Act. Non-settling defendants, however, would be protected insofar as any settlement entered into by the plaintiff with defendants would be made public and, if reasonable, would be an offset against any final judgment entered against non-settling defendants. This unique reasonableness hearing would forestall "sweetheart deals" between a plaintiff and a defendant that would adversely affect non-settling defendants.[2] Senate Journal, 47th Legislature (1981), at 636 (hereinafter "1981 Senate Journal").
RCW 4.22.060(1) required that non-settling defendants be given five days' notice of any settlement between a plaintiff and a defendant. *311 The non-settling defendant would have the opportunity to request a hearing on the reasonableness of a settlement. If the court found the settlement to be reasonable, the amount of the reasonable settlement would generally constitute an offset to any judgment against the non-settling defendants. RCW 4.22.060(2). The court, however, could determine that a settlement was unreasonable and set another amount for the offset. RCW 4.22.060(2). The risk of a settlement rested with the plaintiff.[3] An unreasonable settlement would still be valid; only the amount of the offset to the judgment rendered against non-settling defendants would be affected. Glover v. Tacoma General Hospital, 98 Wash.2d 708, 716, 658 P.2d 1230 (1983). In fact, the statute barred any adjustment of the settlement amount if it was found to be unreasonable. RCW 4.22.060(3).
The factors pertaining to the reasonableness of a settlement were left to elaboration by the courts. The Glover court set forth a number of factors to be analyzed in determining whether or not a settlement was reasonable:
[T]he releasing person's damages; the merits of the releasing person's liability theory; the merits of the released person's defense theory; the released person's relative faults; the risks and expenses of continued litigation; the released person's ability to pay; any evidence of bad faith, collusion, or fraud; the extent of the releasing person's investigation and preparation of the case; and the interests of the parties not being released.
Glover, at 717, 658 P.2d 1230. No one factor controls. Glover, at 718, 658 P.2d 1230. Those factors were explicitly approved in a report of the Senate Judiciary Committee dated April 1984. In that report, the Senate Judiciary Committee recommended that the courts adopt rules for the conduct of reasonableness hearings under RCW 4.22.060.[4]See also Schmidt v. Cornerstone Investments, Inc., 115 Wash.2d 148, 795 P.2d 1143 (1990); Adams v. Johnston, 71 Wash.App. 599, 860 P.2d 423 (1993), review denied, 124 Wash.2d 1020, 881 P.2d 253 (1994).

Five-Day Notice Under RCW 4.22.060(1)
In the present case, the Brewers plainly did not comply with the five-day notice provisions of RCW 4.22.060(1). Although a non-settling defendant may waive written notice of the reasonableness hearing, Zamora v. Mobil Oil, 104 Wash.2d 211, 222-23, 704 P.2d 591 (1985); Fraser v. Beutel, 56 Wash.App. 725, 785 P.2d 470, review denied, 114 Wash.2d 1025, 794 P.2d 508 (1990); Pickett v. Stephens-Nelsen, Inc., 43 Wash.App. 326, 717 P.2d 277 (1986), the statute requires notification. As the Fraser court noted at 731, 785 P.2d 470: "The importance of notice of the reasonableness hearing to the [non-settling defendant] cannot be overemphasized." In the ordinary case where a hearing on the reasonableness of the settlement was held upon proper notice to the parties who received the settlement documents, non-settling defendants would not be prejudiced by the mere tardiness of the scheduling of the hearing itself. The tardy convening of the hearing did have a prejudicial impact on the parties in this case, however, when the trial court appeared to analyze the reasonableness of the settlement as of the time of the hearing, rather than as of November 7, 1991, the date of the settlement itself. The parties have compounded that problem in their arguments to this court by focusing on post-November 7, 1991 events.

Reasonable Settlement
The record in the present case suggests that the trial court had three values before it as to the settlement between the Manville Trust and the Brewers. The Brewers received only $21,000 in actual payments. Br. of App't, at 13. There was testimony before the trial court that the present value of the settlement between the Brewers and the Trust was $48,125.[5] Clerk's Papers, at 163.
*312 The declaration of one of the attorneys for the Brewers, to which an economist's letter was attached, supported the $48,125 figure. Clerk's Papers, at 161-67. That declaration specifically indicates, however, that the declarant obtained the information for evaluation of the settlement in a meeting and a subsequent telephone conversation with the acting executive director of the Trust on September 1, 1992, nearly one year after the settlement agreement. Clerk's Papers, at 162-63. Finally, there is the $175,000 face value of the November 7, 1991, settlement. Clerk's Papers, at 147.
In the ordinary case, the Legislature contemplated that monies would pass between the plaintiff and the settling defendant on a relatively immediate basis.[6] Structured settlements, such as the one at issue here, where funds are paid out over time, involve more complex considerations, and are vulnerable to post-settlement contingencies in the settling defendant's ability to make future payments.[7] The plaintiffs here received 12 percent of the settlement within 20 days of the receipt and approval of the General Release, and were to receive the remainder of the settlement amount at a time in the future according to the bankruptcy court's Class Action Payment Plan. Clerk's Papers, at 147-48. It bears emphasis that the Brewers knew or should have known upon their execution of the General Release that 88 percent of the ostensible settlement amount was payable under the terms of the Class Action Payment Plan approved by the United States District Court for the Southern District of New York in Findley, et al. v. Blinken, et al. Clerk's Papers, at 147. The Brewers had to know that a rather large contingency loomed in the Manville Trust's future ability to pay.
A careful reading of RCW 4.22.060(2) suggests that a trial court must analyze the reasonableness of the settlement at the time the parties enter into it.[8] In this case, the majority errs in analyzing the reasonableness of the settlement based on information generated after the date of the settlement upon the motion on August 21, 1992, by one of the non-settling defendants to determine the reasonableness of the settlement. Clerk's Papers, at 142-49. The court should have determined reasonableness based only on information generated no later than November 7, 1991, the date the Brewers entered into a settlement agreement with the Manville Trust. This court should not permit hindsight to govern an analysis of whether or not a settlement is reasonable. The parties are confined to an analysis of the reasonableness of the settlement as of November 7, 1991.
The second problem with the majority's analysis here is its emphasis on the amount actually paid in the settlement as the focal point for establishing the amount of the offset. Ordinarily, the dollar amount paid by the defendant to the plaintiff will be the actual value of the settlement as that amount will actually reflect the amount paid by the defendant to the plaintiff. Here, where there is a structured settlement, the court should consider in its reasonableness determination any down payment plus the present value of payments to be received in the future. To adopt the majority's view that the offset will be the amount the plaintiff actually received in the settlement is contrary to the *313 legislative policy underpinning RCW 4.22.060 and the actual wording of the statute.[9] The majority view contradicts the intent of the Legislature, which placed the risk of an unreasonable settlement on the plaintiff. It violates the principle that the offset would be established once and for all in the reasonableness hearing. It requires the court to monitor implementation of settlements to determine how much the plaintiff is actually paid. Finally, from a practical standpoint, it is substantially unfair to plaintiffs who settle on the basis of a structured settlement.
For these reasons, the sounder approach is to analyze settlements for purposes of the RCW 4.22.060 offset on the basis of their actual present cash value as of the date of the settlement agreement.[10]

CONCLUSION
The majority found the $175,000 settlement between the Brewers and the Manville Trust was reasonable, but did not use the amount of the reasonable settlement to calculate the offset to any judgment entered against the non-settling defendants. This approach is contrary to RCW 4.22.060(2).[11] Instead, the majority has found that the offset in this case should be an amount different from the amount of the settlement it determined to be reasonable, that is, $21,000 in monies actually received from the Trust, because of problems that long post-dated the November 7, 1991 settlement.
The actual value of a reasonable settlement in this case should be the present cash value of this settlement on November 7, 1991, taking into consideration any contingencies in the settlement known as of that date. As the trial court heard evidence of the reasonableness of the settlement that post-dated November 7, 1991, the judgment of the trial court should be reversed and the case remanded to the trial court for a new hearing on the reasonableness of the settlement as of November 7, 1991.[12]
GUY and MADSEN, JJ., concur.
NOTES
[1] Verbatim Report of Proceedings, at 6-7, 11.
[2] Verbatim Report of Proceedings, at 7-8.
[3] Verbatim Report of Proceedings, at 23.
[4] Verbatim Report of Proceedings, at 23-24.
[5] Verbatim Report of Proceedings, at 9-10, 25.
[6] Verbatim Report of Proceedings, at 25-28.
[7] Verbatim Report of Proceedings, at 25-26.
[8] Verbatim Report of Proceedings, at 10.
[9] Verbatim Report of Proceedings, at 38.
[10] Verbatim Report of Proceedings, at 39. Mesothelioma, an asbestos-related disease, "is a neoplastic tumor arising from the mesothelial surface lining, with possible contributions from the subsurface tissue of sersosal wallspleural, peritoneal, or pericardial. It is a diffuse malignancy which spreads across the serous surfaces. Medical studies disagree whether pleural or peritoneal mesothelioma is more prevalent among asbestos workers. Although increasing dyspnea may be the presenting symptom, the onset of pleural mesothelioma is insidious and progressive. The same is true of peritoneal mesothelioma except that weight loss is an early symptom." Christopher C. Mansfield, Asbestos: The Cases and the Insurance Problem, 15 Forum 860, 863-64 (1979-80).
[11] Verbatim Report of Proceedings, at 6, 41. Mr. Brewer died some time prior to May 4, 1992.
[12] The original complaint is not in the Clerk's Papers. See Clerk's Papers, at 3, 114.
[13] In the supplemental complaint, the plaintiff named as defendants Fibreboard Corporation; Pittsburgh-Corning Corporation; Keene Corporation, individually and as successor in interest to Baldwin-Ehret-Hill, Inc.; Armstrong Cork Company, Owens Corning Fiberglas Corporation; GAF Corporation, individually and as successor in interest to Ruberoid Company; Owens-Illinois, Inc., a/k/a Owens-Illinois Glass Company; Garlock, Inc.; T & C, plc, f/k/a Turner & Newall, PLC; Anchor Packing Company; Asbestos Corporation, Ltd.; Foster-Wheeler Energy Corporation; E.J. Bartells Company; G.K. Technologies, Inc., successor in interest to General Cable Company; General Electric Company; Okonite Company; Westinghouse Electric Corporation; Ericcsson North America, Inc., successor in interest to Anaconda Wire & Cable Company, and successor in interest to the Continental Cable Company; Cooper Industries, Inc., successor in interest to the Belden Company; Phelps Dodge Copper Products/Phelps Dodge Corporation; Marmon Holdings, Inc., successor in interest to Rockbbestos Company, USX, Inc., successor in interest to American Wire & Steel; Parker-Hannifin Corporation; and Graybar Electric Company, Inc. Clerk's Papers, at 1-2.
[14] Clerk's Papers, at 2.
[15] Clerk's Papers, at 3.
[16] In 1982 Johns-Manville filed for bankruptcy under Chapter 11 and changed its name to the Manville Corporation. On August 22, 1986, the Manville Corporation created the Trust as part of the Second Amended and Restated Plan of Reorganization. "[T]he Trust became the exclusive entity from which to seek compensation for existing and future asbestos health claims caused by exposure to Manville products." In re Joint E. & S. Dists. Asbestos Litig., 120 B.R. 648, 652 (E. & S.D.N.Y. & Bankr.S.D.N.Y.1990); accord In re Joint E. & S. Dists. Asbestos Litig., 129 B.R. 710, 733 (E. & S.D.N.Y. 1991).
[17] Clerk's Papers, at 147-48.
[18] Clerk's Papers, at 147-48.
[19] The Exigent Health Release defines "Released Parties" as "the people and organizations that under the terms of this Release I agree to discharge from certain actual or potential legal duties, claims or liabilities. Released Parties include but are not limited to the Trust, Manville Corporation, all Settling Insurance Companies as defined in the Plan, their trustors, trustees, directors, officers, agents, servants, employees, attorneys, successors and assigns, heirs and executors and any and all other persons or organizations who were entitled to benefit from the injunction entered on November 28, 1988 in the Order Confirming the Plan, and subsequent Orders issued by the U.S. Bankruptcy Court for the Southern District of New York or the U.S. District Court for the Southern District of New York. In this release, the Released Parties are collectively referred to as the `Trust.'"
[20] See Clerk's Papers, at 147-48.
[21] Clerk's Papers, at 185-86.
[22] There is no information in the record indicating the date of Mr. Brewer's death, nor are there any documents in the Clerk's Papers providing information on probate of his estate.
[23] Clerk's Papers, at 231.
[24] Clerk's Papers, at 139-41.
[25] Clerk's Papers, at 140.
[26] Clerk's Papers, at 154.
[27] Clerk's Papers, at 219-22.
[28] Clerk's Papers, at 229.
[29] Appellant Brewer settled with Pittsburgh-Corning Corporation for $45,500.00 after the judgment was entered.
[30] Clerk's Papers, at 233.
[31] See also Philip A. Talmadge, Washington's Product Liability Act, 5 U. of Puget Sound L.Rev. 1 (1981).
[32] Glover v. Tacoma General Hosp., 98 Wash.2d 708, 711, 658 P.2d 1230 (1983).
[33] Glover, at 711, 658 P.2d 1230.
[34] Pickett v. Stephens-Nelsen, Inc., 43 Wash.App. 326, 332, 717 P.2d 277 (1986).
[35] Glover, at 714-15, 658 P.2d 1230.
[36] See Glover, at 718 n. 3, 658 P.2d 1230; Philip A. Talmadge, Washington's Product Liability Act, 5 U. of Puget Sound L.Rev. 1, 19 (1981).
[37] 98 Wash.2d 708, 716, 658 P.2d 1230 (1983).
[38] Glover, at 717, 658 P.2d 1230.
[39] Glover, at 718, 658 P.2d 1230.
[40] Glover, at 718, 658 P.2d 1230; accord Pickett, at 332, 717 P.2d 277.
[41] RCW 4.22.060(1).
[42] Zamora v. Mobil Oil, Corp., 104 Wash.2d 211, 222, 704 P.2d 591 (1985).
[43] Glover, at 710-11, 658 P.2d 1230.
[44] Glover, at 712, 658 P.2d 1230.
[45] Glover, at 716, 658 P.2d 1230.
[46] Glover, at 712, 658 P.2d 1230.
[47] Supra.
[48] 56 Wash.App. 725, 730, 785 P.2d 470, review denied, 114 Wash.2d 1025, 794 P.2d 508 (1990).
[49] Fraser, at 731, 785 P.2d 470.
[50] Br. of Resp't Fibreboard Corp., at 20 n. 3.
[51] Clerk's Papers, at 154.
[52] Clerk's Papers, at 142-46.
[53] Clerk's Papers, at 219-22.
[54] Clerk's Papers, at 219-22.
[55] Clerk's Papers, at 220-21.
[56] Fraser, at 730, 785 P.2d 470.
[57] RCW 4.22.060(2).
[58] Clerk's Papers, at 222. No one takes issue with this finding.
[59] Pierce E. Brewer entered into settlement agreements with Anchor Packing for $500.00; Asbestos Corporation for $6,500.00; Babcock & Wilcox for $3,500.00; the Center for Claims Resolution, Armstrong Cork, GAF and Turner & Newall for $22,500.00; Combustion Engineering for $3,750.00; Foster-Wheeler for $600.00; Garlock for $1,500.00; Keene Corporation for $3,900.00 and Parker Hannifin for $350.00. These total $43,100.00. The trial court found these settlement agreements to be reasonable under RCW 4.22.060. See Clerk's Papers, at 155.
[60] 890 F.2d 753 (5th Cir.1989).
[61] 72 Wash.App. 632, 865 P.2d 527, review denied, 124 Wash.2d 1005, 877 P.2d 1288 (1994).
[62] Krivanek, at 634, 865 P.2d 527.
[63] Krivanek, at 635, 865 P.2d 527.
[64] Krivanek, at 636 n. 3, 865 P.2d 527.
[65] Krivanek, at 636 n. 6, 865 P.2d 527.
[66] Krivanek, at 636, 865 P.2d 527.
[67] Krivanek, at 637, 865 P.2d 527. The court determined the total amount of Krivanek's pension and wage losses to be nearly five times more than the actual jury award.
[68] Krivanek, at 636 n. 3, 865 P.2d 527.
[69] Under terms of the Class Action Payment Plan, all claimants would receive 45 percent of their liquidated values. Once all claimants have received their 45 percent, "then all additional distributions from the pool shall be made pro rata to all claimants". See In re Joint E. & S. Dists. Asbestos Litig., 120 B.R. 648 (E. & S.D.N.Y. & Bankr.S.D.N.Y.1990). In this case, the settlement agreement between Mr. Brewer and the Trust for $175,000.00 would be reduced to 45 percent for a total of $78,750.00. $21,000.00 already paid by the Trust was then subtracted from $78,750.00 leaving the maximum amount the Brewers might receive in the future as $57,750.00. Only when all claimants have received 45% of their liquidated values would the Brewers then be eligible to receive additional pro rata distributions from the Trust. Clerk's Papers, at 166.
[1] Any rights the Plaintiff has in future payments, however, must be assigned to the Defendants to avoid any potential for double recovery.
[1] Both Pierce Brewer and LaJeanne Brewer signed the General Release of the Manville Trust on November 7, 1991. They are referred to hereinafter as "the Brewers".
[2] Thomas V. Harris, Washington's Unique Approach to Partial Tort Settlements: The Modified Pro Tanto Credit and the Reasonableness Hearing Requirement, 20 Gonz.L.Rev. 69, 106 (1984/85).
[3] Indeed, the settling defendant's discharge from liability to the plaintiff or to the non-settling defendants for contribution is unaffected. RCW 4.22.060(3).
[4] Harris, supra note 2, at 126-27.
[5] This number consists of the $21,000 the Brewers actually received plus the total of $27,125 in seven annual payments of $3,875 that could be expected from the Manville Trust, given its uncertain future. Clerk's Papers, at 165. Brewer's brief incorrectly refers to this total of $48,125 as the "present value" of the Manville settlement. Br. of App't, at 27-28. In fact, the economist the Brewers hired properly discounted the stream of $3,875 payments and calculated the present value of that stream to be $17,172. Clerk's Papers, at 165. Thus, the correct actual cash present value of the Manville settlement was not $48,125, but $21,000 plus $17,172, for a total of $38,172.
[6] The 1986 Tort Reform Act substantially limits the number of cases in which a reasonableness hearing will be held. RCW 4.22.070. See also Thomas V. Harris, Washington's 1986 Tort Reform Act: Partial Tort Settlements After the Demise of Joint and Several Liability, 22 Gonz. L.Rev. 67 (1986/87).
[7] In a structured settlement, an annuity is often purchased that pays out funds over a number of years. Such a settlement must be analyzed in terms of the dollars paid for the annuity, or if that number is not available, in terms of the present value of the annuity, and not the total dollars paid over the entire duration of the settlement. See, e.g., Vasilios B. Choulos, Structured Settlements: Cure or Curse Trial, Nov. 1980, at 73, 75.
[8] The 1981 Senate Journal states at 636-37: "the section requires that the amount paid for the release must be reasonable at the time the release was entered into." (Italics mine.)
[9] "A determination by the court that the amount to be paid is reasonable must be secured." (Italics mine.) RCW 4.22.060(1). The implication is clear that the statute contemplates future payments as well as a current payment.
[10] The Brewers argue that the better approach to handling any future problems associated with the settlement is to provide for an assignment of rights under the settlement agreement to the non-settling defendants. The trial court was correct in concluding that this would violate the principle that the plaintiff bore the risk of any settlement. Clerk's Papers, at 221. In effect, such an approach would impose upon the non-settling defendants the risks associated with any settlement entered into by the plaintiff and the settling defendant. This is contrary to the policy of RCW 4.22.060.
[11] "... the claim of the releasing person against other persons is reduced by the amount paid pursuant to the agreement unless the amount paid was unreasonable at the time of the agreement in which case the claim shall be reduced by an amount determined by the court to be reasonable." (Italics mine.) RCW 4.22.060(2).
[12] The trial court should be free to analyze the settlement in light of the Glover factors governing reasonableness. The trial court would also be free to determine that the settlement of $175,000 was reasonable or that it did not reflect the actual present cash value of the settlement as of November 7, 1991, in light of contingencies about collection.