169 P.3d 1 (2007)
MUTUAL OF ENUMCLAW INSURANCE COMPANY, Respondent/Cross-Petitioner,
v.
DAN PAULSON CONSTRUCTION, INC., a Washington corporation, Karen and Joseph Martinelli, and the marital community composed thereof, Petitioners/Cross-Respondents.
No. 79027-2.
Supreme Court of Washington, En Banc.
Argued June 14, 2007.
Decided October 11, 2007.
*4 Robert B. Gould, Attorney at Law, Brian J. Waid, Law Office of Robert B. Gould, Seattle, WA, for Petitioners.
Brent William Beecher, James Morton Beecher, Law Offices of Hackett, Beecher, & Hart, Seattle, WA, K.C. Webster, Attorney at Law, Woodinville, WA, for Respondents.
Stewart Andrew Estes, Keating Bucklin & McCormack, Joseph D. Hampton, Daniel L. Syhre, Betts, Patterson & Mines, P.S., Russell Charles Love, Thorsrud Cane & Paulich, David Michael Jacobi, Wilson Smith Cochran Dickerson, Seattle, Amicus Curiae on behalf of Washington Defense Trial Lawyers.
Bryan Patrick Harnetiaux, Gary Neil Bloom, Harbaugh & Bloom, P.S., Spokane, Amicus Curiae on behalf of Washington State Trial Lawyers Association Foundation.
Julie M. Sund, Andrew C. Cook, Building Industry Association of Washington, Olympia, Amicus Curiae on behalf of Building Industry Association of Washington.
FAIRHURST, J.
¶ 1 Respondent/cross-petitioner Mutual of Enumclaw Insurance Company (MOE) defended its insured, petitioner/cross-respondent Dan Paulson Construction, Inc. (DPCI), against construction defect claims brought by petitioners/cross-respondents Karen and Joseph Martinelli (Martinellis). Shortly before the arbitration hearing on those claims, MOE subpoenaed the arbitrator, explaining in two ex parte letters to the arbitrator that it needed information to resolve its coverage dispute with DPCI. During the hearing, DPCI and the Martinellis reached a settlement, the terms of which included assignment of DPCI's claims against MOE to the Martinellis and the Martinellis' covenant not to execute the resulting judgment against DPCI.
¶ 2 MOE brought this declaratory judgment action against DPCI and the Martinellis to resolve its coverage issues, and the Martinellis cross-complained. The Martinellis now seek review of the Court of Appeals decision reversing summary judgment in their favor on their insurance bad faith claim against MOE. We hold that MOE's subpoena and ex parte communications to the arbitrator constituted bad faith, that MOE did not rebut the resulting presumption of harm to DPCI, and that MOE has not raised a genuine issue of material fact with respect to whether the settlement amount is reasonable.

I. FACTUAL AND PROCEDURAL HISTORY
Background
¶ 3 In February 1998, the Martinellis contracted with DPCI to build their new home in Friday Harbor, San Juan County.[1] In August 2002, the Martinellis initiated arbitration proceedings against DPCI (Martinellis/DPCI arbitration) with the American Arbitration Association (AAA), alleging construction defects. The amount recoverable through the arbitration proceeding was initially *5 limited to $1 million and then later increased to $2 million.
¶ 4 DPCI maintained a comprehensive general liability insurance policy with MOE. DPCI tendered defense in the arbitration proceeding to MOE, which informed DPCI that it would defend under a reservation of rights. Consequently, MOE provided DPCI with assigned defense counsel[2] and simultaneously, through its coverage group (hereinafter MOE), investigated the extent to which the Martinellis' claims against DPCI were covered or excluded by DPCI's policy.
¶ 5 DPCI's policy excluded coverage for DPCI's work, but provided coverage for work performed for DPCI by subcontractors. Therefore, to ascertain which of the Martinellis' claims, if any, were covered, MOE sought to determine which entities performed what work on the Martinellis' home, what construction defects resulted from each entity's work, and the cost to repair each defect. Both DPCI and the Martinellis "cooperated" with MOE's requests for information and documentation, "providing all that MOE requested." Clerk's Papers (CP) at 649 (San Juan County Superior Ct. letter op. (Aug. 19, 2004)) (hereinafter letter op.).
¶ 6 Ultimately, in October 2003, MOE authorized settlement authority of up to $550,000. The Martinellis offered to settle for $1 million, an amount within the limits of DPCI's policy. Both DPCI's assigned defense counsel and DPCI's private counsel recommended that MOE accept the Martinellis' offer. A settlement was not reached before arbitration.
¶ 7 By late October 2003, the arbitration hearing had been scheduled, with a start date of January 6, 2004. A few days after scheduling, the parties informed the arbitrator that they had agreed, at DPCI's request, that any award would be a lump sum award. This deviated from the arbitrator's usual practice of providing a detailed, itemized award. MOE did not learn of the lump sum award agreement until after the arbitration hearing had begun.
¶ 8 MOE attempted to participate in the arbitration hearing. However, MOE did not formally move to intervene and did not ask the arbitrator for permission to attend, as allowed by AAA rules.[3] Instead, MOE informally requested permission to intervene from DPCI or, in the alternative, to have a MOE coverage representative observe. DPCI denied both requests.
¶ 9 On November 21, 2003, MOE filed a declaratory judgment action against DPCI and the Martinellis in San Juan County Superior Court. The purpose of the action was to resolve coverage issues regarding which of the Martinellis' claims were covered and which were excluded under DPCI's policy. MOE did not serve the complaint on either party. On December 15, 2003, MOE informally notified DPCI of the declaratory judgment action by e-mail. The Martinellis did not learn that MOE had filed the action until late December 2003 or early January 2004. MOE did not perfect this first declaratory judgment action.
The arbitration
¶ 10 On December 30, 2003, MOE issued a subpoena duces tecum to the arbitrator, scheduling the arbitrator's deposition upon written questions after the arbitration was concluded. In addition to making a comprehensive request for documents, the subpoena *6 sought the arbitrator's thoughts regarding the arbitration. With the subpoena, MOE sent the arbitrator an ex parte cover letter explaining its coverage issues with DPCI.
¶ 11 DPCI and the Martinellis received the subpoena on Friday, January 2, 2004, two business days prior to the scheduled start of the arbitration hearing. (They did not receive the cover letter, which MOE sent only to the arbitrator. They first learned of the letter from the arbitrator at the commencement of the hearing.) AAA, the Martinellis, and both DPCI's private counsel and assigned counsel promptly demanded that MOE withdraw the subpoena. When MOE disclosed to the Martinellis its intention to send a second letter to the arbitrator, the Martinellis again protested. However, on day two of the hearing, MOE sent a second letter to the arbitrator and all parties, slightly narrowing the subpoena and reiterating its explanation of its coverage dispute with DPCI. Subsequently, MOE struck the subpoena and dismissed its first declaratory judgment action.[4]
¶ 12 During the sixth day of the hearing, the parties reached a negotiated settlement and entered into a stipulated settlement agreement. The agreement provided (1) a lump sum arbitration award of $1.3 million in favor of the Martinellis against DPCI, (2) assignment of all DPCI's insurance coverage and bad faith claims against MOE to the Martinellis, and (3) a covenant by the Martinellis not to execute the arbitration award/judgment against DPCI. The parties submitted their proposed award to the arbitrator, who found it reasonable and approved it. On February 2, 2004, after proper notice and hearing, the San Juan County Superior Court confirmed the arbitration award and reduced it to judgment.
The instant declaratory judgment action
¶ 13 On January 22, 2004, MOE filed the instant declaratory judgment action against DPCI and the Martinellis, seeking to determine what portions of the arbitration award/judgment were payable by MOE pursuant to DPCI's policy. MOE's claim acknowledged that "[s]ome of the damage claimed against [DPCI] is covered by the [MOE] policy, but much of it is subject to policy exclusions." CP at 2. The Martinellis (as DPCI's assignees) then demanded that MOE pay "those amounts which [MOE] acknowledges are due under its policy," which they identified as at least MOE's final settlement authority of $550,000. CP at 212. After MOE refused, the Martinellis counterclaimed in MOE's declaratory judgment action, alleging the contract and insurance bad faith claims assigned to them by DPCI.
¶ 14 The Martinellis and MOE filed cross-motions for partial summary judgment.[5] Initially, the trial court held (a) that MOE acted in bad faith when it interfered in the arbitration proceeding, (b) but that MOE had successfully rebutted the presumption of harm, and (c) that MOE had not violated WAC 284-30-330(6) and (7) by failing to pay undisputed property damage amounts. The Martinellis moved for partial reconsideration relative to the presumption of harm, which the trial court granted. The court additionally denied MOE's affirmative defense of fraud or collusion with respect to the reasonableness of the arbitration award/judgment. The court entered judgment nunc pro tunc in the sum of $1.3 million, plus attorney fees, costs, and interest.
*7 ¶ 15 The Court of Appeals reversed, holding that MOE had not acted in bad faith when it subpoenaed the arbitrator and sent him ex parte correspondence because MOE "had a reasonable need to know the elements of a potential damage award." Mut. of Enumclaw Ins. Co. v. Dan Paulson Constr., Inc., 132 Wash.App. 803, 813, 134 P.3d 240 (2006) (MOE v. DPCI). It also held that MOE had rebutted the presumption of harm because if coverage by estoppel were imposed, MOE's liability "would grossly exceed the alleged harm" to the insured.[6]Id. at 816, 134 P.3d 240.
¶ 16 The Martinellis moved for reconsideration, which the Court of Appeals denied. We granted review. Mut. of Enumclaw Ins. Co. v. Dan Paulson Constr., Inc., 159 Wash.2d 1018, 157 P.3d 403 (2007).

II. ISSUES
A. Did MOE act in bad faith by its subpoena and ex parte communications to the arbitrator?
B. If MOE's conduct constituted bad faith, did MOE succeed in rebutting the resulting presumption of harm?
C. Did MOE raise a genuine issue of material fact concerning the reasonableness of the underlying settlement?
D. Are the Martinellis entitled to attorney fees?

III. ANALYSIS
¶ 17 The Martinellis seek review of the Court of Appeals' reversal of a summary judgment order in their favor. We review summary judgment orders de novo. Van Noy v. State Farm Mut. Auto. Ins. Co., 142 Wash.2d 784, 790, 16 P.3d 574 (2001).
¶ 18 Resolving this matter requires initially that we determine whether MOE acted in bad faith while defending DPCI under a reservation of rights.[7] We hold that MOE's conduct did constitute bad faith. We then examine whether MOE rebutted the presumption of harm that arises from that bad faith and conclude that it did not. Finally, we consider, and reject, MOE's claim that it was denied adequate opportunity to challenge the reasonableness of the underlying settlement between DPCI and the Martinellis.
A. MOE acted in bad faith by its subpoena and ex parte communications to the arbitrator
¶ 19 In third-party insurance coverage,[8] "the insurer agrees to defend and indemnify the insured against liability for risks identified in the policy." Aluminum Co. of Am. v. Aetna Cas. & Sur. Co., 140 Wash.2d 517, 525, 998 P.2d 856 (2000). Where an insurer is unconvinced of its duty to defend, it may defend under a reservation of rights. Truck Ins. Exch. v. VanPort Homes, Inc., 147 Wash.2d 751, 761, 58 P.3d 276 (2002). Under a reservation of rights defense, "`the insured receives the defense promised and, if coverage is found not to exist, the insurer will not be obligated to pay.'" Id. (quoting Kirk v. Mount Airy Ins. Co., 134 Wash.2d 558, 563 n. 3, 951 P.2d 1124 (1998)). The insurer "may defend under a reservation of rights while seeking a declaratory judgment *8 that it has no duty to defend," id., but it must avoid seeking adjudication of factual matters disputed in the underlying litigation because advocating a position adverse to its insured's interests would "constitute bad faith on its part." 1 ALLAN D. WINDT, INSURANCE CLAIMS & DISPUTES: REPRESENTATION OF INSURANCE COMPANIES AND INSUREDS § 8:3, at 8-11 to-12 (5th ed.2007).
¶ 20 An insurer defending its insured under a reservation of rights has "an enhanced obligation of fairness toward its insured" because of the "[p]otential conflicts between the interests of insurer and insured, inherent in a reservation of rights defense."[9]Tank v. State Farm Fire & Cas. Co., 105 Wash.2d 381, 383, 715 P.2d 1133 (1986). Fulfilling this enhanced obligation requires the insurer to meet four criteria: (1) "thoroughly investigate" the claim against the insured, (2) "retain competent defense counsel for the insured," (3) fully inform the insured of "all developments relevant to his policy coverage and the progress of his lawsuit," and (4) "refrain from engaging in any action which would demonstrate a greater concern for the insurer's monetary interest than for the insured's financial risk."[10]Id. at 388, 715 P.2d 1133.
¶ 21 "An action for bad faith[[11]] handling of an insurance claim sounds in tort." Safeco Ins. Co. of Am. v. Butler, 118 Wash.2d 383, 389, 823 P.2d 499 (1992). Claims of insurer bad faith "are analyzed applying the same principles as any other tort: duty, breach of that duty, and damages proximately caused by any breach of duty." Smith v. Safeco Ins. Co., 150 Wash.2d 478, 485, 78 P.3d 1274 (2003). "In order to establish bad faith, an insured is required to show the breach was unreasonable, frivolous, or unfounded." Kirk, 134 Wash.2d at 560, 951 P.2d 1124.
¶ 22 As an insurer defending under a reservation of rights, MOE owed DPCI a duty to refrain from engaging in any "unreasonable, frivolous, or unfounded," id., "action which would demonstrate a greater concern for [MOE's] monetary interest than for [DPCI's] financial risk." Tank, 105 Wash.2d at 388, 715 P.2d 1133. Through its subpoena and ex parte communications to the arbitrator, MOE breached this duty. Therefore, MOE's conduct constitutes bad faith.
¶ 23 The facts are undisputed. On December 30, 2003, one week prior to the start of the Martinellis/DPCI arbitration hearing, MOE subpoenaed the arbitrator in that hearing under purported authority derived from its unperfected first declaratory judgment action. MOE's subpoena sought "[a]ll documents submitted . . . as evidence, from any source," and "[a]ll correspondence between [the arbitrator] and the parties," as well as the arbitrator's thought processes, including which elements of each witness's testimony he found credible or not credible, his detailed itemization of the arbitration award, and his analysis of which work had been performed by subcontractors. CP at 127.
¶ 24 MOE accompanied the subpoena with an ex parte letter informing the arbitrator that MOE was defending DPCI "under a reservation of rights, which reservation is *9 based primarily on the `work' exclusion" in DPCI's policy.[12] CP at 133. The letter stated, "[i]n the arbitration, you will be asked to make a finding of liability and damages, and [MOE] needs more information about the basis for your award (if any)."[13]Id.
¶ 25 MOE provided the subpoena to DPCI and the Martinellis on Friday, January 2, 2004, two business days prior to the start of the hearing. It did not provide them with the letterwhich it sent solely to the arbitrator. DPCI and the Martinellis were first informed of the letter by the arbitrator at the commencement of the hearing. Upon receipt of the subpoena, AAA (on behalf of the arbitrator), DPCI (both private counsel and assigned counsel), and the Martinellis vociferously objected. On day two of the hearing, during a conference about the subpoena and letter, MOE disclosed to the Martinellis its intention to send a second letter to the arbitrator. The Martinellis "protested and urged MOE to not engage in any more direct communications with the arbitrator pending AAA Arbitration's retention of counsel to represent the arbitrator." CP at 646 (letter op.).
¶ 26 MOE ignored that request and proceeded to send a second letter directly to the arbitrator, as well as to counsel for both parties. In this letter, MOE asserted that the subpoena was not improper but did agree to strike those questions relating to the credibility of witnesses. MOE also reiterated the explanation of its coverage dispute with DPCI.[14]
¶ 27 Through its subpoena and not one, but two, ex parte letters to the arbitrator, MOE clearly showed great concern for its monetary interest in establishing which of the Martinellis' claims were excluded from coverage under DPCI's policy. At the same time, MOE displayed little to no concern for how its conduct might affect DPCI's financial risk, which was then being litigated in the arbitration hearing. MOE's great concern for its own interest and lack of concern for DPCI's risk, conclusively demonstrates that MOE had "a greater concern for [MOE's] monetary interest than for [DPCI's] financial risk." Tank, 105 Wash.2d at 388, 715 P.2d 1133. Therefore, MOE acted in bad faith.
¶ 28 We reject the notion that MOE's conduct should be excused as merely "somewhat clumsy" and "improper." MOE v. DPCI, 132 Wash.App. at 813, 134 P.3d 240. Contrary to the Court of Appeals' understanding, MOE did not face "two unreasonable options: risking a bad faith claim by litigating coverage issues prior to the arbitration or paying the entire settlement amount regardless of whether it was based on covered claims." Id. There was no justification for MOE's conduct.
¶ 29 MOE did risk a bad faith claim if it litigated coverage issues with DPCI prior to the arbitration hearing. While defending under a reservation of rights, an insurer acts in bad faith if it pursues a declaratory judgment that it has no duty to defend and that "action might prejudice its insured's tort defense." THOMAS V. HARRIS, WASHINGTON INSURANCE LAW § 14.2, at 14-4 (2d ed.2006). MOE sought to establish which claimed defects were excluded from coverage because they resulted from work performed by DPCI. Simultaneously, DPCI was contesting liability for any defects in the underlying arbitration action. To the extent *10 that MOE prevailed, it would have directly prejudiced DPCI's position in the arbitration, clearly an act of bad faith.
¶ 30 However, MOE was not facing the alternative to "pay[] the entire settlement amount regardless of whether it was based on covered claims." MOE v. DPCI, 132 Wash.App. at 813, 134 P.3d 240. An insurer defending under a reservation of rights is not automatically liable to pay the entire settlement amountprovided the insurer acts in good faith. The settlement amount or judgment is "the presumptive measure of an insured's harm caused by an insurer's tortious bad faith." Besel v. Viking Ins. Co. of Wis., 146 Wash.2d 730, 738, 49 P.3d 887 (2002) (emphasis added). Absent a successful bad faith claim and the resulting coverage by estoppel, the insured "still has the burden of proving how much of the [settlement] should be allocated to covered claims."[15] HARRIS, supra, § 17.8, at 17-19. Thus, MOE was not forced "[a]s a last resort" to "cho[o]se a third option: the subpoena and cover letters to the arbitrator." MOE v. DPCI, 132 Wash.App. at 813, 134 P.3d 240. In fact, MOE was not faced with the prospect of paying the entire amount, regardless of coverage, until its own conductits choice to pursue that third option raised the possibility of a bad faith claim by DPCI.
¶ 31 MOE's course of conduct in pursuing resolution of its coverage issues immediately prior to and during the arbitration trial directly interfered in the defense it was providing to DPCI. The Martinellis correctly argue that simply "filing a parallel declaratory judgment action does not immunize an insurer's bad faith conduct" and "does not provide insurers with an unfettered license to interfere in the insured's liability defense through `unreasonable, frivolous, or unfounded' conduct." Martinelli Suppl. Br. at 3 (quoting Smith, 150 Wash.2d at 484, 78 P.3d 1274). By demonstrating "a greater concern for [its own] monetary interest than for [DPCI's] financial risk," MOE breached the duty it owed to DPCI and consequently acted in bad faith. Tank, 105 Wash.2d at 387-89, 715 P.2d 1133.
B. MOE did not rebut the presumption of harm arising from its bad faith conduct
¶ 32 Having determined that MOE acted in bad faith, we next consider whether MOE rebutted the presumption of harm that arises from that conduct. We conclude that it did not.
¶ 33 In Butler, this court announced that in the third-party context, "if the insured shows by a preponderance of the evidence the insurer acted in bad faith, there is a presumption of harm."[16] 118 Wash.2d at 394, 823 P.2d 499. "[T]he insurer can rebut the presumption by showing by a preponderance of the evidence its acts did not harm or prejudice the insured." Id. The Butler court emphasized, however, that the presumption is not rebutted simply by assignment of the insured's claims against the insurer to another, coupled with a covenant not to execute judgment against the insured.[17]Id. at 399, 823 P.2d 499. Ultimately, "if the insured prevails on the bad faith claim, the insurer is estopped from denying coverage." Id. at 394, 823 P.2d 499.
¶ 34 Butler explained that imposing a presumption of harm is warranted because *11 "`[t]he insured should not have the almost impossible burden of proving that he or she is demonstrably worse off because of [the insurer's actions].'" Id. at 390, 823 P.2d 499 (emphasis added) (second alteration in original) (quoting ALLAN D. WINDT, INSURANCE CLAIMS AND DISPUTES: REPRESENTATION OF INSURANCE COMPANIES AND INSUREDS § 2.09, at 40-41 (2d ed.1988)). "[S]hifting of the burden [to the insurer] ameliorates the difficulty insureds have in showing that a particular act [by the insurer] resulted in prejudice. It also recognizes the fact that loss of control of the case is in itself prejudicial to the insured." Id. at 392, 823 P.2d 499 (citation omitted).
¶ 35 MOE argues that requiring an insurer to prove a negativethat its bad faith conduct did not harm or prejudice the insured effectively imposes an almost impossible burden on the insurer. MOE's argument echoes the concern raised by the dissent in Butler. There, Justice James M. Dolliver objected that presuming a harm that encompasses "the whole penumbra of loss" "is unreasonable . . . because [the insurer] can never rebut it." Id. at 407, 823 P.2d 499 (Dolliver, J., dissenting). As did the Butler majority, we acknowledge, but reject, this argument.
¶ 36 The nature of the tort of insurer bad faith dictates that an "`almost impossible burden'" of proof will fall either on the insured or the insurer. Id. at 390, 823 P.2d 499 (quoting WINDT, supra, § 2.09, at 40-41). As the Butler court recognized, "`[t]he course cannot be rerun, no amount of evidence will prove what might have occurred if a different route had been taken.'" Id. at 391, 823 P.2d 499 (quoting Transamerica Ins. Group v. Chubb & Son, Inc., 16 Wash. App. 247, 252, 554 P.2d 1080 (1976)). Either the insured will face the almost impossible burden of proving that "`he or she is demonstrably worse off because of'" the insurer's bad faith or the insurer will face the almost impossible burden of proving the reverse. Id. at 390, 823 P.2d 499 (quoting WINDT, supra, § 2.09, at 40-41). As between the insured and the insurer, it is the insurer that controls whether it acts in good faith or bad. Therefore, it is the insurer that appropriately bears the burden of proof with respect to the consequences of that conduct.
¶ 37 With the Butler presumption of harm, this court announced a policy choice to protect third-party insureds and dissuade insurer bad faith. In the more than 15 years that have elapsed since Butler, the legislature has not altered the Butler presumption, nor has this court retreated from it. We agree that "an insured should not be required to prove what might have happened had the insurer not breached its duty to defend in bad faith; that obligation rightfully belongs to the insurer who caused the breach." Kirk, 134 Wash.2d at 563, 951 P.2d 1124. "[I]mposing a presumption of prejudice only after the insured shows bad faith adequately protects the competing societal interests involved. It provides a meaningful disincentive to insurers' bad faith conduct while protecting insurers from frivolous claims." Butler, 118 Wash.2d at 392, 823 P.2d 499. We reaffirm the Butler presumption of harm framework. As we have stated before, "[t]o hold otherwise would provide an incentive to an insurer to breach its policy." Truck, 147 Wash.2d at 766, 58 P.3d 276.
¶ 38 Turning to the facts of this case, we hold that MOE did not successfully rebut the presumption of harm that arose from its bad faith conduct. MOE did not prove that its subpoena and ex parte communications with the arbitrator prior to and during the arbitration hearing "did not harm or prejudice [DPCI]." Butler, 118 Wash.2d at 394, 823 P.2d 499. To the contrary, the record supports that MOE's conduct caused significant uncertainty and increased risk for DPCI's defense.[18] MOE's bad faith conduct *12 interfered in DPCI's final hearing preparation, interjected insurance coverage issues into the arbitration, and created uncertainty concerning potential prejudicing of the arbitrator and the effect of MOE's interference on the confirmability of the arbitration award.
¶ 39 We reject the trial court's initial conclusion that DPCI's decision to proceed with the arbitration despite MOE's bad faith conduct, coupled with a subsequent settlement within policy limits, effectively rebuts the presumption that MOE's bad faith harmed DPCI.[19] Such a conclusion is inconsistent with the rationale of Butler and its progeny, which recognize "that loss of control of the case is in itself prejudicial to the insured." Id. at 392, 823 P.2d 499. It is impossible to predict what course the Martinellis/DPCI arbitration might have taken but for MOE's bad faith. DPCI's decisions to proceed with the arbitration hearing and to settle do not absolve MOE from the consequences of its actions.
¶ 40 Because MOE failed to demonstrate that its subpoena and ex parte communications "did not harm or prejudice" DPCI, id. at 394, 823 P.2d 499, we need not determine whether the attorney fees incurred by DPCI in responding to that subpoena, standing alone, would be sufficient to prevent MOE from rebutting the presumption of harm. We do note, however, that MOE and the Court of Appeals merely assumed that the trial court reversed its conclusion regarding the presumption based on DPCI's attorney fees. On reconsideration, the Martinellis argued both that DPCI suffered actual harm in the form of attorney fees incurred in responding to MOE's subpoena and that MOE's bad faith had created increased and unexpected risks for DPCI that themselves constitute harm. The trial court held simply that MOE had "failed to [] rebut the presumption of harm imposed under [Butler] as a result of its bad faith," without stating why it changed its ruling. CP at 690.
¶ 41 Finally, we emphasize that while we are not retreating from Butler, neither are we extending it. The presumption of harm has previously been applied where the insurer's bad faith was associated with its underlying defense of the insured.[20] That limitation is unchanged by our decision today. MOE's bad faith conduct, although perpetrated by its coverage counsel, was intrinsically associated with its underlying defense of DPCI. The conduct cannot reasonably *13 be segregated from that defenseit occurred while MOE was actively defending DPCI and interfered directly in that defense. This case does not present, and we express no opinion regarding, a factual situation in which the insurer fully and satisfactorily discharges its duty to defend and only thereafter engages in bad faith conduct solely in connection with its coverage duties. Here we hold only that, in this third-party reservation of rights situation in which MOE's bad faith interfered in its defense of DPCI, MOE did not rebut the presumption of harm. As a result, the Martinellis prevail on their bad faith claim, and MOE is estopped from denying coverage.
C. MOE did not raise a genuine issue of material fact concerning the reasonableness of the underlying settlement
¶ 42 Where coverage by estoppel applies, "the amount of a covenant judgment is the presumptive measure of an insured's harm caused by an insurer's tortious bad faith if the covenant judgment is reasonable."[21]Besel, 146 Wash.2d at 738, 49 P.3d 887. Once the covenant judgment is found to be reasonable, "the burden shift[s] to the insurer to show that the settlement [i]s the result of fraud or collusion." Truck, 147 Wash.2d at 765, 58 P.3d 276. Absent such a showing, the insurer is liable even beyond the limits of the insurance policy because through its bad faith, the insurer "has voluntarily forfeited its ability to protect itself against an unfavorable settlement." Id. at 765-66, 58 P.3d 276. MOE argues that it has been deprived of an opportunity to challenge whether the Martinellis/DPCI settlement amount was reasonable. We disagree.
¶ 43 Three different triers of fact the arbitrator and two trial courts-have determined that the Martinellis/DPCI settlement amount is reasonable.[22] It is true that MOE did not participate in the arbitration proceeding wherein the arbitrator initially found the settlement to be reasonable. However, MOE had the opportunity to challenge the award before the two other tribunals.
¶ 44 First, the San Juan County Superior Court found the award to be reasonable when it confirmed the award and reduced it to judgment. MOE concedes that it had notice of that proceeding but did not seek to intervene therein. We reject MOE's contention that participating would have been futile because the trial court's authority to overturn the arbitrator's finding of reasonableness was limited by the statutory scheme governing arbitration awards.[23]
¶ 45 Second, MOE did challenge the award in the instant declaratory judgment action. MOE tried and failed to persuade the trial court that the settlement was the product of fraud or collusion. The trial court on summary judgment denied MOE's affirmative defense of fraud or collusion with respect to the reasonableness of the arbitration award/judgment and held that "no genuine issue of fact exists as to the reasonableness" of the award, which "is reasonable as a matter of law." CP at 690 (letter op.). MOE has not raised a genuine issue of fact concerning the reasonableness of the underlying settlement.
*14 D. The Martinellis are entitled to attorney fees
¶ 46 The Martinellis request their reasonable attorney fees and costs on appeal, pursuant to RAP 18.1(a). As the prevailing party, the Martinellis should be awarded their fees and costs in connection with this appeal.

IV. CONCLUSION
¶ 47 We hold that MOE acted in bad faith through its subpoena and ex parte communications to the arbitrator. We also hold that MOE did not rebut the resulting presumption of harm to DPCI. Finally, we hold that MOE has not raised a genuine issue of material fact with respect to whether the settlement amount is reasonable. We reverse the Court of Appeals and remand to the trial court for further proceedings consistent with this opinion.
WE CONCUR: GERRY L. ALEXANDER, C.J., TOM CHAMBERS, CHARLES W. JOHNSON, SUSAN OWENS, BARBARA A. MADSEN, RICHARD B. SANDERS, JAMES M. JOHNSON, BOBBE J. BRIDGE, JJ.
NOTES
[1] In 2001, DPCI and the Martinellis successfully arbitrated a dispute concerning the final construction price, which was approximately $1.725 million. Subsequently, the Martinellis sued their architects for, inter alia, alleged design and construction defects. That suit was dismissed in 2003 after the parties settled for an undisclosed amount.
[2] There are no allegations of bad faith raised against the defense counsel assigned by MOE to defend DPCI.
[3] American Arbitration Association (AAA) Rule R-24 provides that "[t]he arbitrator and the AAA shall maintain the privacy of the hearings unless the law provides to the contrary. Any person having a direct interest in the arbitration is entitled to attend hearings. The arbitrator shall otherwise have the power to require the exclusion of any witness, other than a party or other essential person, during the testimony of any other witness. It shall be discretionary with the arbitrator to determine the propriety of the attendance of any person other than a party and its representative."

Mut. of Enumclaw Ins. Co. v. Dan Paulson Constr., Inc., 132 Wash.App. 803, 812 n. 11, 134 P.3d 240 (2006) (MOE v. DPCI) (quoting AM. ARBITRATION ASS'N, CONSTRUCTION INDUSTRY ARBITRATION RULES AND MEDIATION PROCEDURE (INCLUDING PROCEDURE OF LARGE, COMPLEX CONSTRUCTION DISPUTES), Rule R-24, Attendance at Hearings (amended and effective Sept. 15, 2005) (AAA 2005)); see also CP at 445.
[4] On January 9, 2004, MOE took voluntary nonsuit against the Martinellis in its declaratory judgment action. CP at 7-8, ¶ 15; 13, ¶ 15. Two weeks later, MOE took voluntary nonsuit against DPCI in that action. Id.
[5] The Martinellis asked the court to hold that MOE had acted in bad faith through its subpoena and ex parte communications to the arbitrator in the underlying arbitration, as well as by failing to promptly adjust and pay "undisputed property damage amounts due under its policy" as required by WAC 284-30-330(6) and (7). CP at 225-58. The Martinellis also requested the court to hold that the arbitration award was reasonable and did not result from fraud or collusion.

MOE asked the court to hold, inter alia, that MOE was "not liable to the Martinellis for bad faith." CP at 259-80. The Martinellis objected to MOE's motion regarding bad faith with respect to interference in the arbitration because MOE had invoked privilege and prevented the Martinellis from completing their deposition of MOE's coverage counsel. The Martinellis argued, therefore, that there remained issues of material fact relative to MOE's motion.
[6] The Court of Appeals agreed with the trial court that MOE did not violate WAC 284-30-330 because "MOE still does not know whether any portion of the arbitration award was based on covered claims." MOE v. DPCI, 132 Wash.App. at 817, 134 P.3d 240. The court left the trial court's reasonableness determination intact, noting in dicta only that it agreed "that MOE never had a meaningful opportunity to contest the arbitrator's reasonableness finding." Id. at 818 n. 29, 134 P.3d 240.
[7] As a preliminary matter, we grant the Martinellis' motion to strike that portion of the supplemental brief of MOE wherein MOE urges this court to announce a broad new rule applying the affirmative defense of "unclean hands" to third-party coverage by estoppel situations. MOE concedes that it raises the "unclean hands" argument for the first time in its supplemental briefing. Addressing the issue is not necessary to reach a proper decision on this case, and we decline to do so.
[8] Third-party coverage "indemnif[ies] an insured for covered claims which others [third-party claimants] file against him." THOMAS V. HARRIS, WASHINGTON INSURANCE LAW § 1.2 (2d ed.2006). By contrast, first-party coverage "pay[s] specified benefits directly to the insured when a `determinable contingency' occurs," "allow[ing] an insured to make her own personal claim for payment against her insurer." Id.
[9] All "[i]nsurance companies must conduct their relations with their insureds in good faith." Coventry Assocs. v. Am. States Ins. Co., 136 Wash.2d 269, 276, 961 P.2d 933 (1998). In addition to mere "honesty and lawfulness of purpose toward its policyholders[,] an insurer must deal fairly with an insured, giving equal consideration in all matters to the insured's interests." Tank v. State Farm Fire & Cas. Co., 105 Wash.2d 381, 386, 715 P.2d 1133 (1986). Thus, the insurer's duty is fiduciary in nature but is "something less than a true fiduciary relationship," which would require the insurer to "place the insured's interests above its own." Safeco Ins. Co. of Am. v. Butler, 118 Wash.2d 383, 389, 823 P.2d 499 (1992).
[10] The defense counsel retained by the insurer to defend the insured under a reservation of rights must meet distinct criteria as well. Tank, 105 Wash.2d at 388-89, 715 P.2d 1133. Defense counsel owes a "duty of loyalty" to the client-insured, informed by the understanding that counsel "represents only the insured, not the company." Id. at 388, 715 P.2d 1133. Defense counsel also "owes a duty of full and ongoing disclosure to the insured." Id. The instant case involves no allegations that DPCI's assigned defense counsel acted in bad faith by failing to meet these criteria.
[11] The duty to act in good faith and liability for acting in bad faith refer to the same obligation. Tank, 105 Wash.2d at 385, 715 P.2d 1133.
[12] The cover letter quoted the policy's work exclusion, as follows:

Damage to Your Work
"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".
This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.
CP at 133.
[13] MOE also provided the arbitrator with a copy of its complaint in the declaratory judgment action. Thus, the arbitrator had received a copy of the complaint, but DPCI and the Martinellis, the defendants to the action, had not, as MOE had yet to serve it upon them.
[14] MOE's letter explained:

[T]he policy at issue is not first party coverage; it is a liability policy, and any obligation that [MOE] may eventually have (other than defense) is based entirely on the Award. Particularly in light of both parties['] refusal to allow a[MOE] representative even to be present at the arbitration, objections to the present discovery seem ill-founded.
CP at 151-52.
[15] MOE's conduct in this case seemingly reflects its understanding of this rule. After the Martinelli/DPCI settlement was reduced to judgment, MOE refused to pay the entire judgment or any portion thereof until the Martinellis proved what parts of the judgment reflected covered claims under DPCI's policy.
[16] This court has declined to extend the presumption of harm to the first-party coverage context, which lacks the potential conflicts of interest between insurer and insured that are inherent in the third-party reservation of rights context. Coventry, 136 Wash.2d at 281, 961 P.2d 933.
[17] Butler explained "that a covenant not to execute, coupled with an assignment of rights and an agreed settlement, does not release the insurer from its obligations." 118 Wash.2d at 397, 823 P.2d 499. Moreover, "even though the agreement insulates the insured from liability, it still `constitutes a real harm because of the potential effect on the insured's credit rating . . . [and] damage to reputation and loss of business opportunities.'" Id. at 399, 823 P.2d 499 (alterations in original) (quoting Barr v. Gen. Accident Group Ins. Co. of N. Am., 360 Pa.Super. 334, 342, 520 A.2d 485, 489 (1987)).
[18] Dan Paulson of DPCI stated:

I was upset when I learned of [MOE]'s subpoena to the [arbitrator]. . . . [I]t created a lot of uncertainty because neither I nor my attorneys could determine how the Arbitrator might react to the subpoena. I was very concerned that the subpoena would prompt the Arbitrator to withdraw or otherwise delay the arbitration hearing, or that it might have resulted in a challenge to the outcome of the hearing by the Martinellis.
CP at 531, ¶ 4 (Decl. of Dan Paulson).
DPCI's private counsel stated:
I was very upset that [the subpoena and ex parte contacts] had happened, and . . . I had concerns about how that would affect [the arbitrator] and how that would affect [the Martinellis and their counsel] and how that would affect my client and [assigned defense counsel's] ability to prepare for the caseor the imminent arbitration hearingwith that kind of issue present in everybody's thought processes at that time.
CP at 513 (Dep. of Griffith F. Flaherty, May 21, 2004).
DPCI's assigned defense counsel expressed "significant displeasure" to MOE regarding MOE's issuing of the subpoena and said that "there was no doubt in my mind that [the arbitrator] was displeased." CP at 527-28 (Dep. of Gregory G. Jones, May 21, 2004).
[19] In its initial letter opinion, the trial court rejected the argument that there was no harm "because the arbitrator never made any ruling since the parties settled," determining this fact was "not determinative." CP at 650 (letter op.). However, the trial court reasoned that the presumption of harm was rebutted, as

the arbitrator and the parties all agreed to continue with the arbitration despite the subpoena and cover letters, that the difference between a lump sum settlement award and a differentiated award did not lead to a different financial outcome for [DPCI], that the $ 1.3 million award came well within the policy limits, and that any affect on [DPCI's] credit rating or reputation would have occurred whether [DPCI] entered into a stipulated agreement or not.
MOE v. DPCI, 132 Wash.App. at 814, 134 P.3d 240.
[20] Butler imposed the rebuttable presumption of harm where the insurer had allegedly (1) delayed two months in notifying the insured of its reservation of rights defense, (2) delayed investigation, thereby allegedly damaging that underlying defense, and (3) commingled defense and coverage files. 118 Wash.2d at 395-400, 823 P.2d 499. See also VanPort Homes, 147 Wash.2d at 763-66, 58 P.3d 276 (presumption of harm arising from insurer's "unconscionable delay" and bad faith failure to defend); Besel, 146 Wash.2d 730, 49 P.3d 887 (presumption of harm arising from insurer's bad faith failure to settle); Kirk, 134 Wash.2d at 562-65, 951 P.2d 1124 (holding presumption of harm and coverage by estoppel apply under a policy of professional liability insurance if the insurer fails to provide a defense to the insured in bad faith).
[21] The reasonableness of a covenant judgment is assessed under the Glover criteria. Besel, 146 Wash.2d at 738, 49 P.3d 887. Those criteria are:

"[T]he releasing person's damages; the merits of the releasing person's liability theory; the merits of the released person's defense theory; the released person's relative faults; the risks and expenses of continued litigation; the released person's ability to pay; any evidence of bad faith, collusion, or fraud; the extent of the releasing person's investigation and preparation of the case; and the interests of the parties not being released."
Id. (alteration in original) (internal quotation marks omitted) (quoting Glover v. Tacoma Gen. Hosp., 98 Wash.2d 708, 717, 658 P.2d 1230 (1983), overruled on other grounds by Crown Controls, Inc. v. Smiley, 110 Wash.2d 695, 756 P.2d 717 (1988)).
[22] "A trial court's finding of reasonableness is a factual determination that will not be disturbed on appeal when supported by substantial evidence." Brewer v. Fibreboard Corp., 127 Wash.2d 512, 524, 901 P.2d 297 (1995) (citing Glover, 98 Wash.2d at 718, 658 P.2d 1230).
[23] "Arbitration is a statutory proceeding and the rights of the parties to it are controlled by statutes." N. State Constr. Co. v. Banchero, 63 Wash.2d 245, 249, 386 P.2d 625 (1963). "A superior court may only confirm, vacate, modify or correct an arbitrator's award [and s]uch an action is strictly limited to the statutory bases for confirmation, vacation, modification or correction." Barnett v. Hicks, 119 Wash.2d 151, 156-57, 829 P.2d 1087 (1992) (citations omitted).